UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOSEPH HEID,

        Plaintiff,

v.                                            Case No: 6:20-cv-727-RBD-DCI

MARK RUTKOSKI, et al.,

        Defendants.
_____/

## ORDER

This cause is before the Court on the Motion for Summary Judgment filed by Mark Rutkoski and Forrest Best (Doc. 136). Plaintiff filed a Response (Doc. 139) to the Motion for Summary Judgment. Defendants filed a Reply (Doc. 146) to the Response.

### I. FACTUAL BACKGROUND

Plaintiff filed a Second Amended Complaint (Doc. 12). He alleges that, on April 26, 2016, he "was at his private residence located at 9549 Holbrook Drive, Orlando, Florida 32817, when the Orange County Sheriff's Department dispatched deputy sheriffs to his residence in order to apprehend or arrest Plaintiff Heid." (Doc. 12 at 3.) He exited his home with his hands up, verbally informing the officers he was unarmed and surrendering. (*Id.* at 4.) Plaintiff

states that Defendants Rutkoski and Best, who were both Orange County Deputy Sheriffs, shot him "when he exited his home with his hands up and away from his body." (*Id*. at 4.) Rutkoski fired twice into Plaintiff's left thigh without warning. (*Id*. at 5.) Plaintiff turned his back and was shot again, and he fell face down to the ground and was shot again. (*Id*.) Plaintiff then rolled onto his back and was shot again. (*Id*.) Collectively, Rutkoski and Best shot Plaintiff six times. (*Id*.) Plaintiff alleges that Rutkoski and Best should have known that he (Plaintiff) was surrendering and that he (Plaintiff) had no weapons. (*Id*. at 4.)

There was an underlying state criminal case in which Plaintiff was found guilty of one count of attempted first degree murder and three counts of aggravated assault with a weapon. (*Id*. at 2.) Plaintiff states he is currently serving a twenty-year sentence.[1] (*Id*.) Plaintiff states he had also been charged with two counts of resisting an officer with violence, but no action was taken on those counts. (*Id*.). He further states Rutkoski and Best were State witnesses at his trial. (*Id*. at 2-3.) However, there is no indication from the Second Amended Complaint as to who were the victims of the attempted murder and aggravated assault.

---

[1] The Court notes that Plaintiff filed a copy of his sentence separately from the Second Amended Complaint, which reflects that he received a total sentence of life imprisonment. (Doc. 20-2.)

The Second Amended Complaint contains two counts. Count One involves Defendant "Orange County Sheriff's Office." John W. Mina in his official capacity as Sheriff of Orange County filed a Motion to Dismiss (Doc. 41), which the Court granted. (Doc. 74.)

Count Two involves Defendants Rutkoski and Best. Plaintiff states these Defendants knew or should have known that he was surrendering and unarmed and that he posed no threat to these Defendants. (*Id*. at 8.) He alleges these Defendants "can articulate no facts that show that Plaintiff Heid violated or refused to follow any of their commands, prior to their shooting him." (*Id*.) Plaintiff has asserted an excessive force claim against Rutkoski and Best (Count Two).

Best submitted an Affidavit (Doc. 136-4) stating that, on April 26, 2016, while on patrol, he received a radio communication at 10:45 p.m. "from Deputy Joseph Kramer requesting backup from two additional patrol units at 9549 Holbrook Drive in Orlando, Florida in response to a 911 call regarding a domestic battery." (*Id*. at 2.) Upon arrival, Deputies Kramer and Lewis advised him that a felony domestic battery had occurred and that Plaintiff was in the house alone. (*Id*.) Best was also advised that Plaintiff threatened to kill his stepson (who believed that Plaintiff would shoot him), that probable cause existed to arrest Plaintiff for the crime of felony domestic battery by

strangulation, and that there were multiple guns in the residence including military style rifles and shotguns. (*Id*. at 2-3.)

Deputy Rutkoski assigned Best to watch the front door, and Best took a position behind Rutkoski's patrol vehicle. (*Id*. at 3.) Best heard Deputy Johnerick Sanchez "yell commands at Plaintiff" and then heard Johnerick on the radio announce "He's in the back! He's in the back!" (*Id*.) Best ran through the front door of the house to assist Sanchez, and, when he reached the kitchen, he heard Sanchez announce over the radio that Plaintiff was entering the house. (*Id*.) Best knew there were guns in the house, and he immediately turned around and exited the house. (*Id*. at 4.) Best and Rutkoski took cover behind a patrol vehicle. (*Id*.) Best heard gunfire from the rear of the house and believed that Plaintiff was shooting at the deputies. (*Id*.)

Shortly after the gunfire stopped, Plaintiff exited the home through the front door in a threatening manner and threw an unknown object in Best's direction; Best thought the object was a grenade or a distraction. (*Id*.) Plaintiff continued to close in on Best's position and brought both hands back towards his waist, which caused Best to believe that Plaintiff was reaching for a weapon. (*Id*. at 4-5.) Best believed that Plaintiff, who had already engaged in a gunfight with deputies in the back yard, was intending to continue the gunfight in the front

yard. (*Id*. at 5.) Within two to three seconds of Plaintiff advancing toward Best's position, Best discharged his firearm, firing between five or six rounds. (*Id*.)

Rutkoski submitted an Affidavit (Doc. 136-5) stating that, on April 26, 2016, while on patrol, he received a telephone call at approximately 11:00 p.m. from Deputy Joseph Kramer requesting his presence at 9549 Holbrook Drive in Orlando, Florida in response to a 911 call regarding domestic battery. (*Id*. at 2.) Kramer had developed probable cause to believe that Plaintiff had committed felony domestic battery by strangulation. (*Id*.) Upon arrival, Rutkoski was informed that Plaintiff threatened to kill his stepson and that Plaintiff had an AK-47, four or five rifles, an SKS, three shotguns, and a couple of handguns. (*Id*. at 3.) Rutkoski instructed Sanchez to go to the back of the property. (*Id*.)

Using the patrol vehicles' public address system, Rutkoski identified himself and ordered Plaintiff to exit the house with his hands up. (*Id*.) Rutkoski then heard Sanchez announce over the radio, "He's going back in the house.!" (*Id*.) Kramer and Deputy Patrick Lewis then ran to the backyard to check on Sanchez. (*Id*.) Rutkoski then heard a loud gunshot from the backyard, which Rutkoski believed came from a shotgun. (*Id*. at 4.) Rutkoski heard dozens of gunshots over the next several seconds, which Rutkoski believed were from Plaintiff discharging one of the rifles or shotguns that Plaintiff kept in his house. (*Id*.)

Rutkoski and Best took cover behind a patrol vehicle, and Rutkoski heard Sanchez over the radio say he was uninjured. (*Id.*) Kramer and Lewis did not respond, and Rutkoski feared they had been shot. (*Id.*) Rutkoski saw an object being thrown from the house, which he thought was an explosive device or a diversion. (*Id.*) The object was later determined to be a beer can and landed within several feet of the vehicle. (*Id.*) Plaintiff then charged towards Rutkoski, causing Rutkoski "to fear that [Plaintiff] intended to continue the gunfight with law enforcement; therefore, [Rutkoski] discharged [his] firearm." (*Id.*) Rutkoski believed Plaintiff was still in possession of a firearm or weapon at the moment he discharged his firearm. (*Id.*) Rutkoski discharged 14 rounds in rapid succession within approximately two to three seconds. (*Id.*)

Plaintiff testified at his deposition that, on the day of the shooting, he had been drinking Four Lokos, an alcoholic beverage, throughout the day. (Doc. 136-1 at 119.) His wife had also consumed alcohol on that day, and she became inebriated. (*Id.* at 123-25.) His wife "became belligerent . . . and very verbally abusive." (*Id.* at 127.) Another woman staying at their home, Catherine, was also drunk on the evening of the shooting. (*Id.* at 133.) Plaintiff and his wife had a verbal argument, which "got really ugly." (*Id.* at 136.)

Plaintiff left the home at about 9:00 p.m. "to try to cool things." (*Id.*) Plaintiff left the house on two occasions that evening. (*Id.* at 138.) When he left

the first time, "it just got loud, cussing and cursing, and it wasn't—nothing was being solved. It just kept getting worse and worse." (*Id.* at 139.) The argument was between Plaintiff and his wife. (*Id.*) Plaintiff was going to drive away, but his wife stated she would "call the police for a DUI if [he] left." (*Id.* at 140.) Plaintiff was gone from the home for "[a]bout an hour." (*Id.* at 141.) Plaintiff "walked [by himself] to the park," which was "three or four blocks away." (*Id.*)

When Plaintiff returned home, he and his wife argued again and it "became a physical altercation." (*Id.* at 143.) He put his wife in a submissive hold. (*Id.* at 143- 45.) Plaintiff's stepson became concerned for his mother's well-being and hit Plaintiff in the back of the head. (*Id.* at 145.) Plaintiff "pinned" his stepson and then left the house a second time to cool off. (*Id.* at 147-50.) Plaintiff again went by himself to the park. (*Id.* at 149.)

Plaintiff left for about an hour and returned to the backyard of his house. (*Id.* at 151.) He did not "go through the house, . . . [he] just went straight to the backyard." (*Id.*) Plaintiff sat against a grapefruit tree in his backyard and was smoking cigarettes to calm himself down. (*Id.* at 153.) Plaintiff then heard "the rustling of the leaves" and saw a flashlight. (*Id.* at 154.) The person holding the flashlight was not in Plaintiff's yard; rather, he was on the other side of the fence. (*Id.* at 156.) Plaintiff heard the rustling of leaves behind him and in his backyard.

(*Id.*) Plaintiff noticed two individuals in his yard along with the individual on the other side of the fence. (*Id.* at 158.) Plaintiff did not know who they were. (*Id.*)

Plaintiff asked the individual with the flashlight "are you going to shoot me." (*Id.* at 159.) The individual did not reply. (*Id.* at 162.) Plaintiff walked up to the person with the flashlight and noticed that the flashlight was on the bottom of a handgun barrel. (*Id.* at 166.) There were two individuals in his backyard and another individual on the other side of the fence. (*Id.* at 198, 200.) Plaintiff did not know that they were law enforcement. (*Id.* at 200.) He believed that they were friends of his stepson. (*Id.*)

After the individual failed to reply, Plaintiff went to his back porch. (*Id.* at 182.) As he walked toward the porch, Plaintiff saw another person in the bushes. (*Id.* at 185.) Plaintiff asked the person in the bushes, "you got anything to say," and the person did not reply. (*Id.*) Plaintiff heard no commands from the individuals. (*Id.* at 198.)

Plaintiff next went to his back porch and smoked a cigarette. (*Id.* at 195.) He then heard shots being fired in his direction. (*Id.* at 196-97.) Plaintiff denied having any weapons in his possession at any point that evening. (*Id.* at 197, 202.) Plaintiff fell into the bathroom in his home, slipped, and landed in the shower. (*Id.* at 203-04.) Plaintiff was unaware that the individuals shooting at him were

law enforcement. (*Id*. at 200.) Plaintiff believed the individuals were friends of his stepson. (*Id*. at 187, 200-01, 217-18.)

Plaintiff left the bathroom and proceeded rapidly to the front door. (*Id*. at 205, 210.) Plaintiff wanted the individuals to follow him through the front door and lead them out of the house, in order to protect his family. (*Id*. at 205-06, 210.) Plaintiff was not carrying any items. (*Id*. at 207.) Shots were being fired as he proceeded to the front door. (*Id*. at 207-11.) Plaintiff opened the front door and was screaming, "I'm coming out. I'm unarmed, don't shoot. I'm coming out. I surrender, I give up." (*Id*. at 213-14, 217, 224.) Plaintiff proceeded "very slowly," and his hands were "up and away from [his] person, not fully extended, but . . . up and away from [his] person." (*Id*. at 216.) Plaintiff was not handling any items as he stepped from the front door. (*Id*. at 207.)

Plaintiff went down a walkway and noticed law enforcement. (*Id*. at 218-19.) Plaintiff heard no law enforcement commands. (*Id*. at 219.) Plaintiff then noticed "two sheriffs right there. I can see them." (*Id*.) At that moment, "Rutkoski, from right there to there, pop-pop. He shoots me in my leg . . . . So I turned my back to him, and he shoots me again." (*Id*. at 219.). Plaintiff then "got on the ground." (*Id*.). Plaintiff saw Rutkoski fire a gun, but he did not see Best do so. (*Id*. at 220.) Neither Rutkoski nor Best said anything before firing shots. (*Id*. at

222.) Plaintiff was struck six times, and he was struck after he went to the ground. (*Id*. at 224-26.)

Before Plaintiff exited the front door, he had no knowledge that law enforcement had been summoned to his home. (*Id*. at 137.) Plaintiff was unaware that a family member called 911, and Plaintiff first learned of the presence of law enforcement when he saw them in his front yard after he exited the front door. (*Id*. at 137.)

Plaintiff admitted owning many guns but denied using or handling any guns on the night of the shooting. (*Id*. at 168, 172-74, 181, 197-98, 202.) Plaintiff did not know how his gun ended up on his back porch on the night of the incident or how forensics crime scene investigators recovered six shell casings of a .32 caliber on his bathroom floor. (*Id*. at 175-76, 180.)

## II. PLAINTIFF'S CRIMINAL PROCEEDINGS

As a result of Plaintiff's conduct on April 26, 2016, he was charged by amended information on February 2, 2018, with attempted first degree murder of a law enforcement officer (Sanchez) (Count One), aggravated assault with a deadly weapon of a law enforcement officer (Sanchez) (Count Two), resisting an officer with violence (Sanchez, Lewis, Kramer) (Count Three), and resisting an officer without violence (Rutkoski, Best, Sanchez, Lewis, Kramer) (Count Four). (Doc. 136-14.) A jury found Plaintiff guilty as to the lesser-included offense of

attempted second degree murder of a law enforcement officer in Count One and guilty as to Counts Two, Three, and Four.[2] (Doc. 136-18 at 1-3.) (*Id*. at 2.) The trial court adjudicated Plaintiff guilty of the crimes and sentenced him to "[l]ife, plus fifteen." (Doc. Nos. 136-1 at 248, 136-19.)

"Under Florida law, a defendant in a civil proceeding may use collateral estoppel to prevent a plaintiff who previously was convicted by plea in a criminal case from relitigating an issue disposed of in his criminal proceedings, even though the civil defendant was not a party to the criminal case." *Cortes v. Broward Cnty., Fla.*, 758 F. App'x 759, 765 (11th Cir. 2018). Defendants argue that the collateral estoppel doctrine applies to these facts: "Plaintiff knew that Deputy Sanchez was a law enforcement officer; Plaintiff intentionally disobeyed lawful orders by Deputy Sanchez to stop and get his hands up; [and] Plaintiff attempted to murder Deputy Sanchez by shooting at him with his Winchester rifle." (Doc. 136 at 14.)

### III.   LEGAL STANDARD

Summary judgment is appropriate only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[2] The jury found that Plaintiff discharged a firearm during the commission of the offense in Count One. (Doc. 136-18 at 2.)

a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–324. If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1992).

Thus, once the moving party has discharged its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen v. Bd. Of Pub. Educ.*, 495 F.3d 1306, 1314 (11th Cir. 2007).

### IV.   ANALYSIS

Plaintiff alleges that Defendants Best and Rutkoski

> knew, or should have known, that Plaintiff Heid was surrendering and that he was unarmed, while he was slowly exiting his personal residence, that he posed no threat the Defendants. But even if the Defendants were unsure, they had a duty to verbally forewarn the Plaintiff that he could be shot, unless he followed their verbal instructions and commands—but the Defendants directed no verbal forewarnings to the Plaintiff Heid, before they shot him.

(Doc. 12 at 8.) According to Plaintiff, Defendants Best and Rutkoski "shot Plaintiff Heid for no reason; and, by doing so, they abused their legal authority 'under color of law,' in violation of Plaintiff Heid's Fourth Amendment Right to be free from unreasonable searches and seizures." (Doc. 12 at 9.)

Defendants allege that they are entitled to qualified immunity. "Qualified immunity protects a government official from being sued for damages under § 1983 unless preexisting law clearly establishes the unlawfulness of his actions,

such that any reasonable official in his position would be on notice that his conduct was unlawful." *Hunter v. City of Leeds*, 941 F.3d 1265, 1278 (11th Cir. 2019). To obtain qualified immunity, "an official must first establish that he was acting within his discretionary authority when he engaged in the allegedly unlawful conduct." *Id.* Once the official establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff "to show that the officers violated his constitutional rights, and that those rights were clearly established at the time of the alleged misconduct." *Id.*; *see also Montero v. Nandlal*, 597 F. App'x 1021, 1024 (11th Cir. 2014) (the plaintiff must satisfy a two-part test to meet this burden: (1) he must show that the officer's conduct violated a constitutional right, and (2) if so, the plaintiff must also show that the right was clearly established at the time of the incident). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (citation and quotation omitted).

Here, Best and Rutkoski were performing discretionary functions when responding to a 911 call and assisting efforts to arrest Plaintiff. *See Hunter*, 941 F.3d at 1278 n.16 ("[t]he pursuit and apprehension of suspected criminals is a core discretionary function of the police."). Thus, the burden shifts to Plaintiff to show that Best and Rutkoski "violated his constitutional rights and that those

rights were clearly established at the time of the allege misconduct." *Id.* Plaintiff alleges that Best and Rutkoski violated his clearly established Fourth Amendment right not to be subjected to excessive force. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court determines there is a genuine factual dispute as to whether Best and Rutkoski unconstitutionally subjected Plaintiff to excessive force in violation of clearly established law.

"The use of deadly force by the police is a seizure subject to the Fourth Amendment's requirement of reasonableness." *Id.* at 1278. Determining reasonableness is "a fact-specific inquiry that turns on such factors as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 1279 (citation and quotation omitted). Reasonableness should be "determined from the perspective of the officer, and not with the 20/20 vision of hindsight." *Id.* (citation and quotation omitted). An officer may constitutionally use deadly force when he or she

> (1) has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm; (2) reasonably believes that the use of deadly force was necessary to prevent escape; and (3) has given some warning about the possible use of deadly force, if feasible.

*Montero v. Nandlal*, 597 F. App'x 1021, 1026 (11th Cir. 2014) (citations and quotation omitted).

Accepting Plaintiff's account of the events leading to the shooting, the Court concludes that Best and Rutkoski violated his Fourth Amendment right to be free from the use of excessive force. Taking the facts in the light most favorable to Plaintiff, Plaintiff was unarmed as he exited the front door,[3] and he came out of the front door yelling, "I'm unarmed, don't shoot. I'm coming out. I surrender, I give up." Moreover, Plaintiff was shot while on the ground. *Hunter v. Leeds*, 941 F.3d 1265, 1280 (11th Cir. 2019) ("using deadly force without warning on an unarmed, non-resisting suspect who poses no danger is excessive."). There is no indication, based on Plaintiff's version of the facts, that that he posed a risk to anyone when he exited the front door.

Best and Rutkoski are nonetheless entitled to qualified immunity unless Plaintiff can show that his Fourth Amendment rights were "clearly established"

---

[3] "Under Florida law, collateral estoppel will preclude relitigation of an issue when (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies, and (4) a final decision has been rendered by a court of competent jurisdiction." *Wingard v. Emerald Venture Florida LLC*, 438 F.3d 1288, 1293 (11th Cir. 2006) (citation and quotation omitted). Here, Plaintiff was convicted of attempted second-degree murder of a law enforcement officer (Officer Johnerick Sanchez), with a special finding that he discharged a firearm during the commission of the offense. The parties here are in privity with the State for purposes of this suit. Thus, Plaintiff would be estopped from claiming he did not use a firearm during the incident; however, collateral estoppel would not go so far as to prevent him from denying that he had a gun in his possession while he exited the front door.

at the time of the shooting. Assuming Plaintiff's version of the facts to be correct, as the Court must do in reviewing a defendant's motion for summary judgment, existing case law provided sufficient warning to alert Best and Rutkoski to the fact that shooting Plaintiff, under these circumstances, would constitute excessive force in violation of the latter's Fourth Amendment rights. *Robinson v. Sauls*, 46 F.4th 1332, 1345 (11th Cir. 2022) ("using deadly force on a suspect who had been but was no longer a threat was unconstitutionally excessive."). At this juncture, viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, the Court finds there is a genuine factual dispute as to whether Best and Rutkoski unconstitutionally subjected Plaintiff to excessive force in violation of clearly established law. Ultimately a jury must resolve this fact question. Accordingly, qualified immunity for Best and Rutkoski is not warranted on these facts.

### IV.  CONCLUSION

Accordingly, it is **ORDERED** and **ADJUDGED** that the Motion for Summary Judgment filed by Mark Rutkoski and Forrest Best (Doc. 136) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida on December 16, 2023.



ROY B. DALTON, JR.
United States District Judge

Copies furnished to:

Counsel of Record